Paul DUNLAP, Plaintiff,

v.

Katie HILGENKAMP, LaDonna Shippen, in her individual capacity, Roberta Stick, Dr. Edward M. Stringham, Child Guidance Center, Karen Dunlap, Legal Services of Southeast Nebraska, Defendants.

No. 4:98CV3341.

United States District Court,
D. Nebraska.

Jan. 25, 2000.

James A. Mullen, Lefler, Mullen Law Firm, Omaha, NE, for plaintiff.

Mary C. Gaines, DeMars, Gordon Law Firm, Lincoln, NE, Richard L. Boucher, Boucher Law Firm, Lincoln, NE, Royce N. Harper, Attorney General's Office, Lincoln, NE, Michael J. Rumbaugh, Nebraska Department of Health and Human Ser-

vices, Lincoln, NE, Francis T. Belsky, Katskee, Henatsch Law Firm, Omaha, NE, Douglas L. Kluender, Wolfe, Snowden Law Firm, Lincoln, NE, Douglas J. Peterson, Knudsen, Berkheimer Law Firm, Lincoln, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

In the context of a summary judgment motion, this case involves the novel question of whether a social worker violated a custodial father's constitutional rights when she failed to tell the father where his child might be found. On the facts of this case, I conclude that the social worker has qualified immunity.

### I. BACKGROUND

First, I review the plaintiff's claims. Then I review the facts.

#### A.

Plaintiff Paul Dunlap, the natural father of Kelly Dunlap ("Kelly"), a minor child, brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants have violated his constitutional rights to the care, custody, and maintenance of his minor child; to family integrity; and to procedural due process when Defendants conspired to take and conceal Kelly from her father, despite their knowledge of a temporary custody order entered by a Nebraska state district court in Paul Dunlap's favor. Paul Dunlap alleges that the temporary custody order was served on Karen Dunlap, Kelly's natural mother, on November 1, 1994, and the defendants assisted Karen in concealing Kelly, ignoring Paul's requests for help in locating his daughter, and failing to accomplish Kelly's return to her father until December 19, 1994.

Paul has sued his now ex-wife, Karen; Katie Hilgenkamp, Director of the Sexual Abuse Program for defendant Child Guid-

ance Center, who counseled Karen at relevant times; the Child Guidance Center, an outpatient psychiatric mental health center; Dr. Edward M. Stringham, a clinical psychologist who treated Karen at all relevant times; LaDonna Shippen in her individual capacity, a Child Protective Services caseworker with the Nebraska Department of Health & Human Services; Legal Services of Southeast Nebraska ("Legal Services"), a non-profit corporation; and Roberta Stick in her individual and official capacities, a licensed attorney and Executive Director of Legal Services who served as Kelly's court-appointed guardian ad litem pursuant to an order from the Separate Juvenile Court of Lancaster County, Nebraska.

#### B.

The material undisputed facts are set forth below. I state those facts in the light most favorable to the plaintiff.[1]

Paul and Karen Dunlap are the natural parents of Kelly Dunlap, who was either four or five years old at all times relevant to this action. In December, 1992, Karen Dunlap contacted defendant LaDonna Shippen (Shippen) at the Nebraska Department of Social Services to make a self-referral for abuse. Specifically, Karen reported having memories of digitally penetrating her daughter's vagina on at least two occasions. (Filing 68, Dep. Shippen, at 32:6.) Shippen was at all times material hereto a caseworker with the Nebraska Department of Health & Human Services and its predecessor, the Department of Social Services. (Filing 53, Aff. Shippen.)

As a result of Karen Dunlap's statements, a neglect petition was filed in the Separate Juvenile Court of Lancaster County, Nebraska, entitled *State of Nebraska in the Interest of Kelly Dunlap, a child under 18 years of age*, Doc. 50, Page 495. Karen Dunlap eventually admitted to allegations of neglect and Kelly Dunlap was adjudicated as a child subject to the juvenile court's jurisdiction pursuant to Nebraska law. On May 10, 1993[2], the

---

**1.** Most of these facts are taken from the plaintiff's brief.

**2.** When referring to the date of the juvenile court orders, I have used the date that ap-

pears immediately before the judge's signature rather than other dates (like the date of hearings) that appear on those documents.

juvenile court ordered, in part, as follows: (a) Kelly Dunlap is placed under the supervision of the Nebraska Department of Social Services; (b) Karen Dunlap shall undergo psychological testing as arranged and directed by Child Protective Services to ensure the best interests of Kelly Dunlap; (c) the Nebraska Department of Social Services and guardian ad litem shall have access to Kelly Dunlap at all reasonable times and places; and (d) Karen Dunlap shall have a minimum of nine (9) hours of supervised visitation with Kelly Dunlap as arranged and directed by the Nebraska Department of Social Services. (Filing 56, Def. Shippen's Index of Evidence, Ex. 1.)

The juvenile court specifically found that it had no jurisdiction over Paul Dunlap, as there had been no findings or allegations regarding the parental care provided by Paul Dunlap to Kelly Dunlap. (*Id.*) Shippen was assigned by the Department of Social Services to act as the ongoing caseworker regarding the juvenile court proceeding. (Filing 68, Dep. Shippen, at 22:25–23:8.)

In the fall of 1994, while the juvenile court proceeding was pending, Kelly Dunlap resided with Paul and Karen Dunlap at their residence. This was true until Karen Dunlap left with Kelly Dunlap on October 17, 1994. Paul Dunlap did not have contact with Kelly Dunlap from October 17, 1994, until December 14, 1994, when Karen Dunlap came out of hiding with Kelly.

Prior to Karen Dunlap leaving with Kelly Dunlap, the juvenile court gave Karen Dunlap unlimited and unsupervised visitation rights. On September 9, 1994, the juvenile court ordered as follows: (a) that Kelly Dunlap continue under the supervision of the Nebraska Department of Social Services with the previous plan in effect and the visitation schedule as previously approved by the court with the following modifications: Karen Dunlap was to meet with Angie Runyan, M.A., to focus on parenting issues and participation of Kelly Dunlap in those sessions was to be jointly determined by Ms. Angie Runyan and Karen Dunlap; and (b) visitation between Kelly Dunlap and Karen Dunlap was to be unlimited and unsupervised. (Filing 56, Ex. 2.)

On September 22, 1994, approximately four weeks before Karen Dunlap took Kelly Dunlap, Shippen and Hilgenkamp had a discussion concerning Karen Dunlap leaving Paul Dunlap and taking Kelly Dunlap with her. Specifically, Ms. Hilgenkamp asked Shippen if Karen Dunlap could take Kelly Dunlap with her. (Filing 68, Dep. Shippen, at 99:24–100:21.) Shippen testified in her deposition that, at that time, because she felt Karen Dunlap and Paul Dunlap had equal custodial rights, that she did not have a position as to whether Karen Dunlap could remove Kelly Dunlap. (*Id.* at 99:24–100:21.)

Also on September 22, 1994, Shippen telephoned Roberta Stick, a lawyer and guardian ad litem for the child, and notified Stick that Karen Dunlap intended to leave with Kelly Dunlap. According to Shippen, during that conversation Shippen and Stick determined that, because Karen and Paul Dunlap had "the same custodial rights," they had no position regarding Karen Dunlap's plan to leave with Kelly Dunlap. (*Id.* at 104:19–105:8.)

On September 28, 1994, Karen Dunlap called Shippen and informed her of her plan to leave Paul Dunlap and take Kelly Dunlap. (*Id.* at 98:12–99:23.) According to Shippen, "I didn't encourage or not encourage her to leave." (*Id.* at 101:2–3.) As of this time, Shippen had not informed Paul Dunlap of Karen Dunlap's intentions to leave and take Kelly Dunlap with her. (*Id.* at 105:12–24.)

Although there had been great discord between Paul and Karen Dunlap, at no time prior to October 18, 1994, were there any allegations with regard to Paul Dunlap's parenting of, or behavior towards, Kelly Dunlap. In fact, there were no allegations known to Shippen prior to October 18, 1994, that Paul was abusive in any manner toward Kelly Dunlap. (*Id.* at 76:7–77:10.)

On October 18, 1994, Paul Dunlap telephoned Shippen and informed her that Karen Dunlap had removed Kelly Dunlap from their home. (*Id.* at 106:4–16.) Furthermore, Paul Dunlap informed Shippen that Karen Dunlap had been screaming and yelling at Kelly Dunlap. (*Id.* at 107:2–7.)

On October 21, 1994, Shippen delivered a letter to Judge Thorson of the Lancaster County Separate Juvenile Court concerning Karen Dunlap leaving with Kelly Dunlap. (Filing 56, Ex. 4.) The letter stated:

Dear Judge Thorson: This is to notify the Court that Karen Dunlap has now moved out of the residence of Paul Dunlap. Karen left Paul also taking Kelly with her on or about October 17, 1994. This worker is aware of Karen's whereabouts and has spoken with Karen's therapist, Katie Hilgenkamp, regarding the situation. Katie Hilgenkamp has indicated to this caseworker that she does not believe that Kelly is at risk being with Karen. Karen reported that Paul has been very physically abusive to Karen and that until such time that he receives counseling, she is not wanting to allow herself or Kelly to continue to reside with him. The Guardian Ad Litem, Roberta Stick, has also been in contact with Karen Dunlap and is aware of the current status of this case.

(*Id.*)

On November 3, 1994, Karen Dunlap telephoned Shippen and informed her that she had been served with an ex parte order, signed by a Lancaster County District Court Judge and filed with the Clerk of the Court on October 26, 1994, that awarded temporary custody of Kelly Dunlap to Paul Dunlap subject to the reasonable visitation rights of Karen Dunlap. (Filing 56, Ex. 5; Filing 68, Dep. Shippen, at 116:6–118:17.) Although there was a question about whether a judge had actually signed the order, Shippen made no efforts to verify the validity of the ex parte custody order. (Filing 68, Dep. Shippen, at 116:16–22.) Nevertheless, Shippen "encouraged Karen to do the right thing."

(*Id.* at 117:25–118:1.) And the "right thing," according to Shippen, was "[t]o follow the court's orders." (*Id.* at 118:3.)

In Shippen's affidavit offered in support of her summary judgment motion, she states in paragraph 10 that:

On October 21, 1994, I notified the juvenile court by letter that Karen had called and indicated that she was leaving Paul. In the weeks and months that followed, Karen would call me from time to time and inform me of her whereabouts. During that period, she informed me that she was in therapy in Child Guidance and I had sufficient contacts with Child Guidance to know that she, in fact, was in therapy. During this period that she was keeping me apprised of where she was located, the Department did not have physical custody. I had no contact with Paul Dunlap during this period and Paul Dunlap never contacted me directly.

(Filing 53, Aff. Shippen, at 5 (internal citation to exhibit omitted).)

In paragraph 13 of her affidavit, Shippen states the following:

During the period that Karen was absent, either Paul Dunlap or his attorney, did contact me on at least one occasion (possibly two), and asked about the whereabouts of Karen. I did not disclose her location because of Karen's previous allegations of domestic violence against Paul and my belief that I had no duty to do so, and felt that any such contacts should be handled by the attorneys representing the litigants in the divorce.

(*Id.* at 6.)

## II. ANALYSIS

To start, I state the general principles that govern the resolution of a motion for summary judgment based upon the defense of qualified immunity. Then I apply those principles.

## A.

Government officials, like social workers, who are sued for damages in their individual capacities under 42 U.S.C. § 1983 for their performance of discretionary functions are entitled to a qualified immunity defense if they prove that their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is a question of law. To avoid subjecting officials to the distraction and deterrence of unnecessary trials, the Supreme Court has emphasized that summary judgment should be granted to a § 1983 defendant on qualified immunity grounds "if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact . . . violated clearly established law." *Johnson v. Boreani,* 946 F.2d 67, 69–70 (8th Cir. 1991) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

Resolution of the qualified immunity defense in the summary judgment context requires a step-by-step analysis. *See, e.g., Cross v. City of Des Moines,* 965 F.2d 629, 631–33 (8th Cir.1992) (reversing decision denying motion for summary judgment on qualified immunity grounds). First, the court must determine whether the plaintiff has alleged the violation of a constitutional right. *Id.* Second, the court must determine whether the right was "clearly established" at the time of the alleged violation. *Id.* Third, if the constitutional right was clearly established, the court must determine whether there are material facts in dispute regarding the objective reasonableness of the defendant's conduct in light of the law and the facts known to the defendant at the time. *Id.* Lastly, if the facts are undisputed, and the defendant could be found to have acted reasonably if the conduct is viewed objectively, then summary judgment must be granted for the defendant. *Id.*

"For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* at 632 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Although the defendant bears the initial burden of coming forward with facts to suggest he was acting within the scope of his discretionary authority, the plaintiff must demonstrate that the law allegedly violated was clearly established. *Id.* If the plaintiff can show that the defendant's conduct as described by the plaintiff violated clearly established law, then it is the defendant's burden to demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant had at the time of his actions. *Id.*

## B.

Applying these principles, I arrive at two conclusions. First, the contours of the constitutional rights upon which Paul Dunlap relies were (and are) not sufficiently clear that a reasonable official would understand that what she was doing violated those rights. Second, Shippen's actions were objectively reasonable in light of the law and the information she had at the time of her actions.

Keep in mind that there is no evidence that Shippen did anything to deprive or interfere with Paul Dunlap's rights to parent his daughter. The plaintiff has had the benefit of discovery to try to establish that Shippen actively did something to harm him through a conspiracy or otherwise. He has found no evidence of such misbehavior.

Unlike at the pleading stage, I am not now obligated at the summary judgment phase to assume that the facts asserted by the plaintiff in his complaint are true. *See Whisman v. Rinehart,* 119 F.3d 1303, 1309–10 (8th Cir.1997) (motion to dismiss on qualified immunity grounds properly

denied where it was alleged that social workers failed to make an investigation about child abuse before taking child into custody and, thereafter, delayed in initiating post-deprivation hearing; "Qualified immunity is usually raised by a motion for summary judgment after a limited amount of discovery has been conducted to determine whether defendants acted objectively in a reasonable manner and whether a plaintiff's rights were clearly established at the time of the alleged deprivation"; "The balance favors the plaintiffs when the test is based solely on the allegations in the complaint") (citations omitted). Thus, I disregard the plaintiff's factually unsupported claim that Shippen, and other defendants, actively assisted Karen Dunlap in stealing and then hiding the child.

That having been said, I find that the undisputed material facts establish that the social worker did not take the daughter from the father, nor did she help or encourage the mother to do so. Neither did Shippen assist Karen Dunlap in hiding the girl or otherwise aid or abet that behavior. Nor did Shippen counsel Ms. Dunlap to ignore the ex parte order. The evidence establishes only that Shippen did not tell Paul Dunlap where the mother and daughter were residing.

### 1.

It was clearly established that parents have a recognized liberty interest in the care custody, custody, and management of their children, and, absent a compelling governmental interest, the state may not interfere with that liberty interest without due process of law. *Id.* It was likewise clear that "[w]hen the state deprives parents and children of their right to familial integrity, even in an emergency situation, without a prior due process hearing, the state has the burden to initiate prompt judicial proceedings to provide a post deprivation hearing." *Id.* at 1311 (citation omitted). In his complaint, Paul Dunlap

has alleged violations of these clearly established rights.

Nonetheless, I can find no cases that hold directly, or that may be fairly read to suggest, that a state social worker violates a custodial father's right to family integrity [3] when the social worker, while refusing to tell the father where his daughter is located, has done nothing, directly or indirectly, to deprive the father of his right to the care, custody and management of the child. I reiterate that Ms. Dunlap, and not the social worker, took the child and refused to return her to Mr. Dunlap. At worst, Shippen remained neutral as the parents disputed the issue of legal and physical custody as between themselves.

As our Circuit Court has explained, "the requirement that the right be clearly established at the time of the alleged violation is particularly formidable" when social workers are involved in child abuse cases. *Manzano v. South Dakota Dep't of Soc. Servs.*, 60 F.3d 505, 510 (8th Cir.1995) (reversing district judge's refusal to grant motion for summary judgment based upon qualified immunity asserted by social workers and others where it was claimed that their sexual abuse investigation impermissibly interfered with the father's liberty interest in companionship with his daughter). "In these types of cases, it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis." *Id.*

In summary, I find and conclude that there was no clearly established constitutional right that required a social worker to notify the custodial father of the whereabouts of his daughter when the social worker had done nothing to assist the noncustodial parent in taking or hiding the child. That being the case, Shippen's silence is protected by the doctrine of qualified immunity.

---

**3.** I realize that the constitutional right to "family integrity" includes both a substantive and a procedural component. When I use this term, I mean to describe both components of the right.

### 2.

I turn next to the question of whether Shippen's conduct was objectively reasonable. In so doing, I assume, for the sake of argument, that a broad constitutional principle is the "clearly established" law that I should apply. *But see id.* at 510 (stating that there is a "need to continually subject the assertion of this abstract substantive due process right to a balancing test" and such a balancing test "makes the qualified immunity defense difficult to overcome"). That is, at the time Shippen remained silent, it was clearly established that a parent had a recognized liberty interest in the care, custody, and management of his children, and, absent a compelling governmental interest, the state, through Shippen, could not interfere with that liberty interest without due process of law. I further assume that had Shippen told Paul Dunlap where he might find his daughter, he would have been reunited with the girl much sooner than was the case.

If this more general law is the standard against which Shippen's inaction should be judged, I must decide whether her conduct was objectively reasonable. After careful consideration, I conclude that Shippen's conduct was, objectively tested, reasonable. Indeed, even if I assume that Shippen's conduct was mistaken, she is, nevertheless, entitled to qualified immunity unless a reasonable social worker, knowing what she knew, would have recognized that her silence violated Paul Dunlap's federal constitutional right to family integrity. *Id.* at 512–14 (although social workers' handling of child abuse investigation violated their own regulations and appeared to be "far from textbook perfect," the social workers enjoyed qualified immunity). Given what Shippen knew and what she was charged with doing by the juvenile court, a reasonable social worker would not have come to the conclusion that silence violated Paul Dunlap's constitutional right to family integrity.

Shippen's (and the state's) responsibilities were very limited. According to the juvenile court's orders, she was to assist the mother and child. To do this, she obviously had to maintain a solid working relationship with Karen Dunlap. To have divulged the whereabouts of the mother and daughter to the estranged husband would have strained, and perhaps destroyed, that relationship. Thus, Shippen had a legitimate governmental interest in keeping Karen Dunlap's confidences.

In this vein, I have assumed that on October 18, 1994, Paul Dunlap informed Shippen that Karen Dunlap had been screaming and yelling at Kelly Dunlap at about the time the mother and daughter left. Even so, it is also undisputed that Shippen knew that after Karen Dunlap left the family residence, she continued to receive counseling. In fact, Shippen was told by the therapist that "she does not believe that Kelly is at risk being with Karen." (Filing 56, Ex. 4.) In short, there was no reason to think the child was in any particular danger, even if the custodial father was unaware of where the child might be found.

In addition, the juvenile court's orders did not authorize the social worker to take sides regarding the issue of legal or physical custody as between the parents. Quite the contrary, the orders made clear that the juvenile court, and hence the social worker, had no jurisdiction over that issue. Put simply, the juvenile court did not authorize Shippen to do anything regarding the custody battle.

Still further, Shippen promptly reported to the juvenile court judge that Karen Dunlap had taken the child from the father. The social worker also confirmed with the guardian ad litem, a lawyer, that she should take no position on the custody fight between the parents. And it is also evident that Shippen did nothing to frustrate the divorce court's ex parte temporary order either. If Shippen is believed, and there is no evidence to contradict her, Shippen advised Ms. Dunlap to do the

"right thing" and that was "[t]o follow the [divorce] court's orders." (Filing 68, Dep. Shippen, at 118:1–3.) In fact, Karen Dunlap ultimately, albeit belatedly, complied with the order.

Under these circumstances, Shippen's silence was objectively reasonable. While one might not agree with Shippen's decision[4], a reasonable social worker, generally aware that a custodial parent has a recognized liberty interest in the care custody, custody, and management of his child, could have concluded that silence was the best alternative.

The plaintiff argues that the ex parte order placing custody of the child in the father somehow imposed an obligation upon Shippen to tell Paul Dunlap where the child was located. From the obligation imposed by the ex parte order, the plaintiff further argues that his federal constitutional rights were violated when Shippen remained silent, thereby frustrating the very purpose of the order.

The quick answer to the plaintiff's assertion is that nothing in the ex parte order directed the social worker to do anything. It did not alter or amend the prior juvenile court orders that gave Shippen her quite limited authority. Moreover, by its very nature, the divorce court order was binding only upon Karen Dunlap, and not Shippen. Therefore, the ex parte order cannot be used to impose an obligation upon Shippen where no such obligation is discernible from the order itself.

Lastly, the plaintiff argues that conspiracies are hard to prove and the conspirators seldom admit their wrongdoing. Therefore, and although the plaintiff lacks any evidence that Shippen did anything but remain silent, Paul Dunlap argues that I should deny the motion for qualified immunity so a jury can decide whether Shippen acted to harm him.

I reject this argument. It turns the qualified immunity analysis in the context of a motion for summary judgment on its head. Once Shippen presented hard evidence that she acted in an objectively reasonable manner, Paul Dunlap had the burden, after pursuing discovery, to come forward with evidence to create a factual dispute. Even when I view the evidence in the light most favorable to him, Dunlap has nothing more than speculation to bolster his assertion of affirmative wrongdoing on Shippen's part, and that is not enough. *See, e.g., Mitchell,* 472 U.S. at 526, 105 S.Ct. 2806 ("Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts."); *Wright v. South Arkansas Regional Health Center, Inc.,* 800 F.2d 199, 204–05 (8th Cir.1986) (plaintiff's speculative evidence was "insufficient to overcome plaintiff's responsibility under Rule 56(e) to do more than rest on his pleadings"; reversing refusal to grant summary judgment based upon qualified immunity defense; there was an absence of any evidence that director of Arkansas Department of Human Services was unconstitutionally motivated when he reported alleged misdeeds of the plaintiff to federal criminal justice authorities or that the defendant played any part in the decision to terminate the plaintiff).

### III. CONCLUSION

For two reasons, I find and conclude that LaDonna Shippen has qualified immunity from suit and that her summary judgment motion must be granted. Initially, there was no clearly established constitutional principle that required a social worker to notify the custodial father of the whereabouts of his daughter when the social worker did nothing to assist the noncustodial parent in taking or hiding the

---

**4.** On the other hand, I do not suggest that Shippen could be faulted had she told Paul Dunlap where he might find his daughter. The point is simply that the decision to speak or to remain silent was one where reasonable people could disagree. That, of course, is the quintessential case for qualified immunity.

child. In the alternative, if the legal standard is framed more broadly, a reasonable social worker, generally aware that a custodial parent has a recognized liberty interest in the care custody, custody, and management of his child, could have concluded that silence was the best alternative given the undisputed facts of this case.

Accordingly,

IT IS ORDERED that LaDonna Shippen's motion for summary judgment based upon qualified immunity (filing 53) is granted.