Carol WEIGAND, Plaintiff,

v.

Michael L. SPADT, individually and in his official capacity as Fire Chief; Emergency Medical Services, Inc., a Nebraska corporation; and Dr. Terry Rounsborg, M.D., individually and in his official capacity as Medical Director for Emergency Medical Services, Inc., Defendants.

No. 4:03CV3040.

United States District Court, D. Nebraska.

May 12, 2004.

Anthony C. Coe, Polsky, Shiffermiller Law Firm, Lincoln, NE, for Plaintiff.

Connor L. Reuter, Gail S. Perry, Baylor, Evnen Law Firm, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Plaintiff, Carol Weigand, has been employed by the fire department of the City of Lincoln, Nebraska, for over ten years. Ms. Weigand alleges that she has been discriminated against in her employment because she is female, and that she has been retaliated against for complaining about the discriminatory treatment and also about matters of public concern. Specifically, she alleges that she was subjected to sex discrimination and retaliation by being reclassified from "firefighter/paramedic" to "firefighter" in July 2002, by subsequently not having her paramedic status restored, by being denied training opportunities, and, since January 2003, by being removed from firefighter duty and being placed on administrative duty.

Named as defendants are the fire chief, Michael L. Spadt, who is sued both individually and in his official capacity; Emergency Medical Services, Inc. ("EMS"), an independent contractor that oversees the provision of emergency medical services in the City of Lincoln; and EMS's medical director, Terry Rounsborg, M.D., who is sued both individually and in his official capacity. The defendants claim qualified immunity and have moved for summary judgment on this basis (filings 61, 72).

## I. BACKGROUND

The plaintiff's third amended complaint (filing 30, filed on July 11, 2003) is divided into seven "causes of action," including: (1) an equal protection claim, which asserts that each of the defendants has treated the plaintiff differently than similarly situated male individuals; (2) a due process claim, which asserts that each of the defendants "deprived [the plaintiff] of her liberty interest in her good name, reputation, and her ability to ply her trade, as well as her standing in the community"; (3) another due process claim, which asserts that each of the defendants deprived the plaintiff of certain property rights in her job; (4) a first amendment "free speech" claim, which asserts that each of the defendants punished the plaintiff for speaking out about sex discrimination and about safety concerns; (5) a claim brought under 42 U.S.C. § 1985, which asserts that the defendants all conspired to deprive the plaintiff of her constitutional rights; (6) a Title VII claim,[1] which asserts that "the Defendant, City of Lincoln, and its agents," discriminated against the plaintiff; and (7) another Title VII claim, which asserts that "the Defendant, City of Lincoln, and its agents," retaliated against the plaintiff. The first four causes of action are brought pursuant to 42 U.S.C. § 1983.

Although the City of Lincoln is listed as a defendant in the third amended complaint, and specific allegations are made against it in the sixth and seventh causes of action, the city has been dismissed from the action, pursuant to Fed.R.Civ.P. 12(b)(2) and (5). *See* memorandum and order entered on August 26, 2003 (filing 41).

Chief Spadt's attorney has filed an affidavit (filing 63, attachment # 1) stating that the plaintiff's counsel has confirmed that no Title VII claim is alleged against Chief Spadt in his individual capacity. Accordingly, his claim of qualified immunity is made only with reference to the first five causes of action.

EMS and Dr. Rounsborg both claim to be "state actors," and, as such, also claim entitlement to qualified immunity. In this regard, the evidence (filings 63, 71) shows that EMS is a private, non-profit corporation that has close ties to the City of Lincoln. Six of EMS's seven board members are appointed by the mayor with the approval of the city council. (The seventh member is appointed by the county board.) The city requires EMS to comply with open meetings laws. Amendment of EMS's articles of incorporation must be approved by the city council. The corporation's registered agent is the city clerk. Upon dissolution, all of EMS's remaining assets will devolve to the city.

Pursuant to a contract that EMS entered into on September 22, 2000, with the City of Lincoln, BryanLGH Medical Center, St. Elizabeth Regional Medical Center, and the Lancaster County Medical Society, oversight responsibility for all out-of-hospital emergency medical care that is provided in the "Lincoln emergency medical care system" is assigned to EMS.[2] This

---

1. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17.

2. The contract requires that EMS's annual budget be submitted to and approved by the

system includes "St. Elizabeth, Bry-anLGH, the Lincoln Fire Department, the Lincoln Lancaster County Communications Center in its capacity as dispatch center for emergency medical calls, and any person or entity holding a Certificate of Public Convenience and Necessity issued by the City." The contract requires EMS to employ a medical director who, among other things, is responsible for establishing and enforcing protocols for out-of-hospital emergency medical care. The medical director is specifically authorized to restrict the privileges of any system employee who fails to follow the protocols.

Dr. Rounsborg revoked Ms. Weigand's paramedic privileges in June, 2002, and his decision was upheld by the appeal committee of the EMS board of directors in November 2002. Ms. Weigand's July, 2002 reduction in rank purportedly was ordered by Chief Spadt in response to her loss of paramedic privileges.

Despite obtaining an enlargement of time to respond to the first-filed motion for summary judgment, *see* memorandum and order entered on March 8, 2004 (filing 67), the plaintiff's counsel has not filed any opposing evidence, nor has he filed an opposing brief. Consequently, I will accept as true the version of events that has been provided by Chief Spadt and Dr. Rounsborg in separate affidavits.

The following undisputed facts, among others, are established by Chief Spadt's affidavit (filing 63, attachment # 3):

- Michael Spadt has been Lincoln's fire chief since May 1999; he has been with the fire department since 1980. In his capacity as fire chief, he supervises firefighters, firefighter/paramedics, and other employees in the fire department (which is now known as the "Lincoln Fire and Rescue Department").

- Effective January 1, 2001, emergency ambulance services for patients whose point of origin is within the city limits of Lincoln are, pursuant to municipal ordinance, exclusively provided by the city through the Lincoln Fire and Rescue Department. The department provides out-of-hospital emergency medical care as part of its ambulance service, and also in conjunction with its fire suppression functions.

- All firefighters in the Lincoln Fire and Rescue Department must, minimally, hold a Nebraska State certification as an emergency medical technician (EMT), and must also be authorized by the medical director to function in the Lincoln emergency medical care system. A certain number of firefighters, who have been certified by the State as paramedics and authorized by the medical director (*i.e.*, Dr. Rounsborg) to function as paramedics, are classified as "firefighter/paramedics," which is a higher paying position than "firefighter."

- In a letter dated June 18, 2002, Dr. Rounsborg revoked Ms. Weigand's ability to function as a paramedic in the Lincoln emergency medical services system, and forbade her from performing any advanced life support (ALS) skills. After receiving a copy of that letter on July 8, 2002, Chief Spadt immediately wrote Ms. Weigand to inform her that she was being demoted from firefighter/paramedic to firefighter because of the action taken by Dr. Rounsborg. Her classification has since remained unchanged.

- Chief Spadt's decision to demote Ms. Weigand was made based upon the fact that Dr. Rounsborg had revoked her authority to operate as a paramedic; her gender was not a factor in this decision. Chief Spadt is aware of no male depart-

city council, and that any subsequent changes be authorized by the mayor.

ment employee, past or present, who has had is authority to operate as a paramedic revoked by the medical director and who has not subsequently been demoted from firefighter/paramedic to firefighter.

- Chief Spadt was aware when he demoted Ms. Weigand that she had complained within the department, both personally and through an attorney, about suffering differential treatment because of her sex. Those complaints were not a factor in his decision to demote Ms. Weigand. Chief Spadt was also aware at the time that Ms. Weigand had complained within the department that a particular supervisor had on certain occasions failed to follow proper safety protocols; this alleged "protected speech" also was not a consideration.

The following additional undisputed facts, among others, are established by Dr. Rounsborg's affidavit (filing 71, attachment # 4):

- Dr. Rounsborg received concerns about Ms. Weigand's performance as a paramedic. In response, he reviewed the charts and incident reports in accordance with the procedure he always follows, and he determined that there had been deviations from protocol. He met with Ms. Weigand to discuss the concerns and then outlined a plan of action for her to follow, which he set forth in a letter dated May 2, 2002. The plan required Ms. Weigand to complete further training and to work under the supervision of an approved preceptor. Ms. Weigand orally agreed to complete this plan.
- Ms. Weigand did not progress with this plan in a manner that was satisfactory to Dr. Rounsborg. It was his observation and determination that she was defensive in receiving constructive feedback; she was unable to provide quality patient care in several areas;

she was unable to obtain a clear patient history; she was unorganized in patient assessments; she communicated poorly with other care providers; and she had difficulty managing the patient's airway. These inadequacies resulted in many instances in which the preceptor was required to intervene because of potentially harmful care or lack of care being provided.

- Dr. Rounsborg revoked Ms. Weigand's status as a paramedic in the Lincoln emergency medical care system as a result of these inadequacies, on June 18, 2002. His determinations and actions were in no way based on Ms. Weigand's gender, nor were they in any way discriminatory. Dr. Rounsborg did not receive, review, or rely on any information that related to Ms. Weigand's gender when making the decision to revoke her privileges. Rather, the only information he used in making the decision was information relating to her ability to provide adequate patient care.

## II. DISCUSSION

■ " 'Qualified immunity shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known.' " *Yowell v. Combs,* 89 F.3d 542, 544 (8th Cir.1996) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). To withstand the application of qualified immunity, a plaintiff must assert a violation of a constitutional right; that right must have been clearly established at the time of the violation; and, given the facts most favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action violated that right. *Id.* (citing *Foulks v. Cole County, Mo.,* 991 F.2d 454, 456 (8th Cir.1993)); *see also*

*Buckley v. Rogerson,* 133 F.3d 1125, 1129 (8th Cir.1998) (citing *Burnham v. Ianni,* 119 F.3d 668, 673–74 (8th Cir.1997) (en banc))." *Hall v. Missouri Highway & Transp. Com'n,* 235 F.3d 1065, 1067 (8th Cir.2000).

▆▆▆▆ On a motion for summary judgment, though, a genuine issue as to predicate facts material to the qualified immunity issue will defeat the motion.[3] *See Gregoire v. Class,* 236 F.3d 413, 417 (8th Cir.2000). As further explained in *Smithson v. Aldrich,* 235 F.3d 1058, 1061 (8th Cir.2000):

> A motion for summary judgment on qualified immunity grounds is only precluded when the plaintiff has "(1) assert[ed] a violation of a constitutional right; (2) demonstrate[d] that the alleged right is clearly established; and (3) raise[d] a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated the plaintiff[s'] clearly established right." *Goff v. Bise,* 173 F.3d 1068, 1072 (8th Cir.1999) (quoting *Habiger v. City of Fargo,* 80 F.3d 289, 295 (8th Cir.), *cert. denied,* 519 U.S. 1011, 117 S.Ct. 518, 136 L.Ed.2d 407 (1996)). Stated another way, qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful "in light of clearly established law and the information [that the defendant] possessed." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3037, 97 L.Ed.2d 523

(1987). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam), quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 1097, 1096, 89 L.Ed.2d 271 (1986). Although qualified immunity is "'an immunity from suit rather than a mere defense to liability,'" *Hunter,* 502 U.S. at 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (emphasis omitted) (quoting [*Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)]), and therefore its availability "ordinarily should be decided by the court long before trial," *Hunter,* 502 U.S. at 228, 112 S.Ct. 534, 116 L.Ed.2d 589, the nonmoving party is given the benefit of all relevant inferences at the summary judgment stage, and if a "genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that ground." *Pace v. City of Des Moines,* 201 F.3d 1050, 1056 (8th Cir.2000).

In the present case, therefore, in order to deny Chief Spadt immunity from suit in his individual capacity I must make two findings: First, I must find that the record, when viewed in a light most favorable to the plaintiff, would allow a reasonable finder of fact to conclude that the defendant engaged in a course of conduct that

---

**3.** "Predicate facts" include only the relevant circumstances and the acts of the parties themselves, and not the conclusions of others about the reasonableness of those actions. *Pace v. City of Des Moines,* 201 F.3d 1050, 1056 (8th Cir.2000). Once the predicate facts are established, for the purposes of qualified immunity, there is no such thing as a "genuine issue of fact" as to whether an officer "should have known" that his conduct violated constitutional rights. The conduct was

either reasonable, or it was not, which is a determination of law that should be made at the earliest possible stage in litigation. Thus, when there is no dispute among the parties as to the relevant facts, a court should always be able to determine as a matter of law whether or not an officer is eligible for qualified immunity—that is, whether or not the officer acted reasonably under settled law given the particular set of facts. *Id.*

violated the plaintiff's clearly established constitutional rights.[4] Second, I must find as a matter of law that no reasonable official could have thought that such a course of conduct was lawful.[5] *See Hudson v. Norris,* 227 F.3d 1047, 1050 (8th Cir.2000).

■ With respect to EMS and Dr. Rounsborg, I must also consider, as an initial matter, whether private parties can invoke the protection of qualified immunity for actions they have taken under color of state law. Although the Eighth Circuit once broadly stated that "qualified immunity extends to private party defendants who act in joint participation with public officials," *Lux by Lux v. Hansen,* 886 F.2d 1064, 1067 (8th Cir.1989) (private social worker was entitled to qualified immunity for recommending that dependency and

neglect proceedings be instituted by department of social services),[6] more recently it has observed that "[p]rivate individuals ... are not necessarily shielded from liability under § 1983 by the immunity afforded public officials." *Domina v. Van Pelt,* 235 F.3d 1091, 1096 (8th Cir.2000) (citing *Richardson v. McKnight,* 521 U.S. 399, 402–04, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997)). "Generally, to determine whether a private individual may rely on a qualified immunity defense, the courts look to the policy considerations supporting the doctrine of qualified immunity and to the historical availability of the defense to the group to which the individual belongs." *Id.*

The Supreme Court decided in *Richardson* that privately employed prison guards could not claim qualified immunity in a

---

4. This requisite finding actually involves "a two-part inquiry: 'whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, ... whether that right was clearly established at the time of the alleged violation.'" *Tlamka v. Serrell,* 244 F.3d 628, 632 (8th Cir.2001) (quoting *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999)). In considering a defense of qualified immunity raised by motion for summary judgment, of course, I am not obligated to assume that the facts alleged by the plaintiff in her complaint are true. *See Dunlap v. Hilgenkamp,* 82 F.Supp.2d 1052, 1056 (D.Neb.2000). In order to withstand the motion for summary judgment, the plaintiff "must substantiate her allegations with 'sufficient probative evidence that would permit a finding in her favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles County,* 23 F.3d 1410, 1412 (8th Cir.1994) (quoting *Gregory v. Rogers,* 974 F.2d 1006, 1010 (8th Cir. 1992)). Rule 56(e) provides that, when a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories,

and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As discussed above, the plaintiff in this case has failed to respond to the defendants' motions.

5. "[I]f the law claimed to have been violated was clearly established, the qualified immunity defense ordinarily fails, 'since a reasonably competent public official should know the law governing his conduct.'" *Sexton v. Martin,* 210 F.3d 905, 910 (8th Cir.2000) (quoting *Harlow,* 457 U.S. at 819, 102 S.Ct. 2727).

6. *See also Watertown Equipment Co. v. Norwest Bank Watertown,* 830 F.2d 1487, 1489–90 (8th Cir.1987) (bank, bank's vice president, and bank's attorney could claim qualified immunity for prejudgment attachment of equipment); *Buller v. Buechler,* 706 F.2d 844, 850–52 (8th Cir.1983) (creditors and their attorneys could claim qualified immunity for garnishing auction proceeds). Both of these decisions, however, were abrogated by *Wyatt v. Cole,* 504 U.S. 158, 168 169, 112 S.Ct. 1827, 118 L.Ed.2d 504(1992) (qualified immunity, as enunciated in *Harlow,* is not available for private defendants faced with § 1983 liability for invoking a State replevin, garnishment, or attachment statute).

§ 1983 action brought by prisoners. In reaching this decision, the Court noted that correctional functions have never been exclusively public, and that private contractors managing prisons historically have not been granted immunity from suit for their intentional misconduct. It also determined that the immunity doctrine's purposes (*i.e.*, to protect the public from unwarranted timidity on the part of public officials, to insure that talented candidates are not deterred from entering public service, and to avoid distracting officials from their governmental duties) do not support the application of immunity to private prison guards. In summary, the Court found "nothing special enough about the job or about its organizational structure that would warrant providing these prison guards with a governmental immunity." *Id.*, 521 U.S. at 412, 117 S.Ct. 2100.

■■ EMS and Dr. Rounsborg argue for a different result in the present case because, they contend, they both qualify as "state actors" for § 1983 purposes.[7] In making this argument, the defendants note that the Supreme Court cautioned in *Richardson* that it had "answered the immunity question narrowly, in the context in which it arose. That context is one in which a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms. The case does not involve a private individual briefly involved with a government body, serving as an adjunct to the government in an essential government activity, or acting under close official supervision." *Id.*, 521 U.S. at 413, 117 S.Ct. 2100.

■ Although EMS and Dr. Rounsborg suggest that they fall within one or more of the final three categories of individuals listed by the Supreme Court, the facts indicate otherwise. First of all, EMS's contract with the City of Lincoln, which is stated to be a renewal of a previous agreement, is for a term of four years. This hardly constitutes a "brief involvement" with the city. Secondly, there is no evidence from which to conclude that providing oversight to out-of-hospital emergency medical care providers is an "essential government activity." Rather, it appears that the City of Lincoln has contracted with EMS only because the Nebraska Emergency Medical Services Act requires every entity that provides emergency medical services to be licensed and to have a physician medical director who will be re-

---

7. EMS and Dr. Rounsborg maintain that they "were tightly connected to and controlled by the City of Lincoln." (Filing 70, at 14.) "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). "What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Id.* Among other fact situations giving rise to § 1983 liability, the Supreme Court has "treated a nominally private entity as a state actor when it is controlled by an 'agency of the State,' ... when it has been delegated a public function by the State, ... when it is 'entwined with governmental policies,' ... or when government is 'entwined in [its] management or control,'...." *Id.* at 296, 121 S.Ct. 924 (citations omitted). For purposes of addressing the issue of qualified immunity, I will assume, without deciding, that EMS and Dr. Rounsborg are, in fact, "state actors."

sponsible for providing medical supervision to its employees and verifying that they meet certification requirements. *See* Neb. Rev.Stat. Ann. §§ 71–5175(8), 71–5181, and 71–5183 (LexisNexis 2001). In other words, EMS and Dr. Rounsborg are merely facilitating the city's activities as an emergency medical services license holder. They are performing the same function for the two private, non-profit hospitals that are also parties to the contract. The majority of EMS's compensation, in fact, is provided by the hospitals. (Under the terms of the contract, each year EMS is paid $55,000 by St. Elizabeth, $110,000 by BryanLGH, and $100,000 by the city.) Finally, there is no evidence that EMS or its medical director act under the city's "close supervision" concerning the actual performance of their contractual duties. To the contrary, the contract specifically provides that EMS "shall perform as an independent contractor with sole control of the manner, means, and methods of performing the services required under this Agreement."

It thus appears that EMS was "systematically organized to assume a major lengthy administrative task ... with limited direct supervision by the government." While it is true that EMS is organized as a non-profit corporation, this factor alone is not determinative of the immunity issue. *See, e.g., Rosewood Services, Inc. v. Sunflower Diversified Services, Inc.,* No. 02–2140–JWL, 2003 WL 22090897 at *23 (D.Kan. Sept. 8, 2003) (executive director of non-profit corporation designated by five counties to act as a community mental retardation facility pursuant to State law could not claim qualified immunity; corporation (with board members appointed by the counties) was still faced with the market threat of being replaced if it failed to carry out its duties adequately); *Payton v. Rush–Presbyterian–St. Luke's Medical Center,* 82 F.Supp.2d 901, 906 (N.D.Ill. 2000) (security officers hired by non-profit hospital could not claim qualified immunity; ordinary marketplace pressures still applied); *Halvorsen v. Baird,* 146 F.3d 680, 686 (9th Cir.1998) (private, non-profit corporation operating involuntary detoxification center under contract with county could not claim qualified immunity; non-profit status was "not material, because both profit and nonprofit firms compete for municipal contracts, and both have incentives to display effective performance."). *But cf. Raby v. Baptist Medical Center,* 21 F.Supp.2d 1341, 1357 (M.D.Ala. 1998) (extending qualified immunity to security guards hired by private, non-profit hospital; *Richardson* competitive pressures did not exist because hospital was not competing for government contract, and guards were not providing basic hospital services).

The provision of out-of-hospital emergency medical care is not exclusively a public service.[8] In fact, according to Chief Spadt's affidavit, the City of Lincoln was served by a private company for ambulance transportation and related paramedic (ALS) services until January 1, 2001, when the fire department was designated as the exclusive provider of emergency ambulance services for the city. *See also* Lincoln Municipal Code § 7.08.010.

There does not appear to be any common law immunity for emergency medical care providers, or their supervisors. Many states, including Nebraska, have en-

---

**8.** Nebraska cities are authorized, but not required, to "establish an emergency medical service, including the provision of scheduled and unscheduled ambulance service, as a governmental service." *Neb.Rev.Stat. Ann.* § 13– 303 (LexisNexis 2004). They may also "contract with any city, person, firm, or corporation licensed as an emergency medical service for emergency medical care by out-of-hospital emergency care providers." *Id.*

acted legislation to protect ambulance personnel from liability for their ordinary negligence, *see generally* Frank J. Wozniak, Annotation, *Liability for Negligence of Ambulance Attendants, Emergency Medical Technicians, and the Like, Rendering Emergency Medical Care Outside Hospital*, 16 A.L.R.5th 605 (1993), but such laws generally except intentional torts. Under the Nebraska Emergency Medical Services Act, for example, an out-of-hospital emergency care provider is not liable for "acts of commission or omission arising out of and in the course of his or her rendering in good faith [public emergency] care," but the provider remains liable for "causing damage or injury by his or her willful, wanton, or grossly negligent act of commission or omission." Neb.Rev.Stat. Ann. § 71 5194(1) (LexisNexis 2001). In particular, I find no "firmly rooted" tradition of immunity applicable to medical directors who oversee out-of-hospital emergency care providers.

 As suggested above, I also find no purpose of the qualified immunity doctrine that would be furthered by preventing Ms. Weigand from suing Dr. Rounsborg and EMS. These defendants have a contractual obligation "to restrict the privileges of any out-of-hospital emergency care provider employed by any emergency medical service within the system based upon the refusal or failure of such provider to properly follow any patient care protocol, standing order, or other medical control directive," and, "as required by law, ... [to] report any such refusal or failure to the State of Nebraska for appropriate action in accordance with the Uniform Licensing Law of the State of Nebraska." If they fail to satisfy this obligation (or, conversely, if they act without good cause in revoking privileges), they are unlikely to remain under contract. Although in some respects EMS and Dr. Rounsborg are performing a "public service," a private company providing emergency ambulance service within the City of Lincoln would also be required by State law to retain a medical director to perform essentially the same duties. Finally, while there may be some risk that the lawsuit will distract these defendants from the performance of their contractual obligations, "the risk of 'distraction' alone cannot be sufficient grounds for an immunity." *Richardson*, 521 U.S. at 411, 117 S.Ct. 2100.

For these reasons, the motion for summary judgment filed by EMS and Dr. Rounsborg (filing 72) will be denied. Although it might be argued that summary judgment should be granted to these defendants on one or more of the plaintiff's claims for lack of any evidentiary support, the motion is specifically limited to the issue of qualified immunity.[9] Thus, any merits-based grant of summary judgment in favor of EMS and Dr. Rounsborg would need to be made on the court's own motion.

 A federal district court may grant summary judgment *sua sponte* only if the party against whom judgment will be entered was given sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted. *Bendet v. Sandoz Pharmaceuticals Corp.*, 308 F.3d 907, 912 (8th Cir.2002). In this case, the defendants' brief (filing 70) provides sufficient notice that EMS and Dr. Rounsborg contend there is no evidence that they violated Ms. Weigand's constitutional rights. These defendants, however, obtained a stay of discovery after the plaintiff's counsel expressed his intention to take depositions.

9. The progression orders entered in this case established separate deadlines for filing motions for summary judgment based on qualified immunity and for filing other motions for summary judgment. (*See* filings 45, 54, 57, 59, 64, and 83.)

(*See* filing 65, 75, and 77.) While the requirements of Fed.R.Civ.P. 56(f) have not been satisfied,[10] there is at least some indication in the court file that the plaintiff takes the position that discovery must occur before the court can decide whether there is any evidence to support the claims made against EMS and Dr. Rounsborg. Considering that these defendants still have an opportunity to move for summary judgment on grounds other than qualified immunity, I decline to act *sua sponte.*

Similarly, I will not now consider whether any "official capacity" claims against Chief Spadt should be dismissed for lack of evidence. The only issue to be determined on Chief Spadt's motion for summary judgment is whether he is personally immune from suit for damages on each of the plaintiff's claims.[11]

### A. Equal Protection Claim

In support of her equal protection claim ("first cause of action"), Ms. Weigand alleges that she "has been treated differently by each of the Defendants than similarly situated male individuals in that she has been unfairly and unreasonably subjected to discipline and heightened security; had her paramedic status removed; had her firefighter status removed; and has been denied other employment opportunities because of her sex." (Filing 30, ¶ 26.) The alleged denial of "other employment opportunities" apparently includes her not being allowed to take paid leave for additional paramedic training. (*See* filing 30, ¶ 20.)

 The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated people alike. *Ellebracht v. Police Bd. of Metropolitan Police Dept. of City of St. Louis,* 137 F.3d 563, 565 (8th Cir.1998) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)). Thus, the threshold inquiry in an equal protection case is whether the plaintiff is similarly situated to others who allegedly received preferential treatment. *Domina,* 235 F.3d at 1099. Ms. Weigand has presented no evidence of such disparate treatment. Chief Spadt, on the other hand, has stated that he is aware of no instance in which a male employee was not demoted under similar circumstances, and he has provided evidence that requests for outside training by male employees have been denied with some frequency.[12]

10. Rule 56(f) requires "affidavits of the party opposing the motion [showing] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition."

11. Chief Spadt is not immune from suit for equitable relief. *See Hopkins v. Saunders,* 199 F.3d 968, 976–77 (8th Cir.1999) ("Qualified immunity insulates a defendant from all claims for legal damages, but it does not shield a defendant from claims for equitable relief."). As I read the third amended complaint, however, the plaintiff's claims for equitable relief are directed at Chief Spadt in his official capacity only. That is, Ms. Weigand requests an order that "restore[s] Plaintiff to her firefighter and paramedic status" and requires "that Plaintiff be given an equal opportunity in her employment as other similarly situated male firefighters." (Filing 30, at p. 6.) Because Chief Spadt as an individual cannot reclassify or reassign the plaintiff, or provide her with equal employment opportunities in the fire department, I construe the "individual capacity" claims pleaded against him as requesting only compensatory and punitive damages.

12. Although Chief Spadt generally does not participate in training decisions, fire department records show that in 2003 Ms. Weigand submitted two requests for outside training, one of which was approved. Thirteen requests for outside training by male employees were denied in 2003. In 2002, Ms. Weigand did not request any outside training; nine of the requests submitted by male employees were denied. (Filing 63, attachment # 3, ¶¶ 19–22.)

Evidence of Chief Spadt's intent to discriminate is also essential to the plaintiff's case, and must be considered in connection with his claim of qualified immunity claim. *See Thomas v. Talley,* 251 F.3d 743, 746 (8th Cir.2001). Chief Spadt states in his affidavit that the plaintiff's gender did not factor into any of his decisions. (Filing 63, attachment # 3, ¶ 16.) The plaintiff has not presented any evidence, nor even alleged, that Chief Spadt acted with discriminatory intent.

Further analysis of this equal protection claim is unnecessary. Because there is no triable issue as to whether Ms. Weigand's constitutional rights were violated, Chief Spadt is immune from suit for damages on the "first cause of action."

### B. Due Process Claims

Ms. Weigand next alleges that "Defendant's actions in denying Plaintiff her ability to act as firefighter and paramedic ... violated Plaintiff's rights as secured under the Due Process Clause of the Fourteenth Amendment, and deprived her of her liberty interest in her good name, reputation, and her ability to ply her trade, as well as her standing in the community.... Plaintiff had a legitimate expectation for fair consideration prior to removal of her paramedic and fire status.... Plaintiff has been deprived of both procedural and substantive due process" (Filing 30, ¶¶ 29, 31–32.)

 "To establish a procedural due process violation, [Ms. Weigand] must first demonstrate that [she] has a protected liberty or property interest at stake. *Batra v. Board of Regents of Univ. of Neb.,* 79 F.3d 717, 720 (8th Cir.1996). Secondly, [she] must prove that [she] was deprived of such an interest without due process of law. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990)." *Marler v. Missouri State Bd. of Optometry,* 102 F.3d 1453, 1456 (8th Cir. 1996). To establish a substantive due process claim, Ms. Weigand must also prove that "a government action was 'sufficiently outrageous' or 'truly irrational, that is, something more than ... arbitrary, capricious, or in violation of state law.'" *Young v. City of St. Charles,* 244 F.3d 623, 628 (8th Cir.2001) (quoting *Anderson v. Douglas County,* 4 F.3d 574, 577 (8th Cir.1993)).

 "'An employee's liberty interest is implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges.' *Shands v. City of Kennett,* 993 F.2d 1337, 1347 (8th Cir.1993). In addition to demonstrating that the proffered reasons for [demotion or reassignment] were stigmatizing, an employee asserting violation of a liberty interest must further show that his employer made those reasons public. *See Payne v. Ballard,* 761 F.2d 491, 493 (8th Cir.1985)." *Allen v. City of Pocahontas,* 340 F.3d 551, 556 (8th Cir.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 1420, 158 L.Ed.2d 85 (2004).

 There is no evidence that Chief Spadt made public any information about the demotion or reassignment, nor that Ms. Weigand was stigmatized in any way. She is still employed as a firefighter, and there is no indication that she will be unable to return to her former position or duties, provided that her paramedic privileges are restored by Dr. Rounsborg. His June 18, 2002 letter revoking those privileges specifically informed Ms. Weigand that she could "re-apply for medical control authorization in the Lincoln EMS system" after completing a 48–hour refresher course and a paramedic internship. (Filing 71, attachment # 4, exhibit C.) The appeal committee likewise stated that her medical control authorization was "suspend[ed] ... while remedial steps are taken." (Filing 71, attachment # 4, exhibit D.)

■ "An employee has a property interest in employment under the due process clause if she has a 'legitimate claim of entitlement' to it. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Winegar v. Des Moines Independent Community School District*, 20 F.3d 895, 899 (8th Cir.), *cert. denied*, 513 U.S. 964, 115 S.Ct. 426, 130 L.Ed.2d 340 (1994). A property interest can be in the entire position or in a specific benefit, but 'a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it.' *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Thus, a claimant must demonstrate that there were 'rules or mutually explicit understandings that support [her] claim of entitlement' to her position. *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972)." *Buchanan v. Little Rock School Dist.*, 84 F.3d 1035, 1038 (8th Cir.1996) (school principal who was reassigned to administrative post had no property interest in her status as principal).

■ There is no evidence to support Ms. Weigand's allegation that she had a property interest either in being classified as a "firefighter/paramedic" or in being assigned to firefighter duty. This lack of evidence is fatal both to her procedural due process claim and to her substantive due process claim. *See Young*, 244 F.3d at 627 (analysis of either the procedural or the substantive component of the due process clause must begin with an examination of the interest allegedly violated). "A due process claim 'is cognizable only if there is a recognized liberty or property interest at stake.' *Johnson v. City of Minneapolis*, 152 F.3d 859, 861 (8th Cir. 1998)." *Carpenter Outdoor Advertising Co. v. City of Fenton*, 251 F.3d 686, 689 (8th Cir.2001) (affirming dismissal of procedural and substantive due process claims).

In summary, as was the case with the equal protection claim, the record fails to disclose that there was any violation of the plaintiff's constitutional rights. Chief Spadt therefore is entitled to qualified immunity with respect to the "second cause of action" ("liberty interest" due process claim) and "third cause of action" ("property interest" due process claim).

### C. First Amendment Claim

Ms. Weigand alleges for her "fourth cause of action" that "Defendants' actions in interfering with her rights to work as firefighter and/or paramedic, any by subjecting her to differential treatment, were motivated at least in significant part by the Plaintiff's speech regarding ... matters of public concern [including sex discrimination and matters of worker and public safety]." (Filing 30, ¶¶ 34–35.)

■ A public employee alleging a violation of the right to free speech must show that the speech in question is entitled to the protections of the First Amendment. The speech must address a matter of public concern. *See Buazard v. Meridith*, 172 F.3d 546, 548 (8th Cir.1999). " 'Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context' of the speech, and that speech must relate to some 'matter of political, social or other concern to the community.' " *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 146–47, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

■ "When a public employee's speech is purely job-related, that speech will not be deemed a matter of public concern. ... Unless the employee is speaking as a concerned citizen, and not just as an employee, the speech does not fall under the protection of the First Amendment." *Id.* (citations omitted). A public employee does not necessarily give up her right to free speech, and the protection of the First Amendment, simply because her

speech is private, and not expressed to the public. *See id.* at 549 (citing *Givhan v. Western Line Consolidated School Dist.*, 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)). The internal nature of the employee's speech is, however, a factor to be considered. *See id.*

Whether the employee's speech is about a matter of public concern presents a question of law for the court to decide. *See de Llano v. Berglund*, 282 F.3d 1031, 1036 (8th Cir.) (citing *Connick*, 461 U.S. at 148, 103 S.Ct. 1684), *cert. denied*, 537 U.S. 973, 123 S.Ct. 434, 154 L.Ed.2d 330 (2002). Matters of public concern include matters of political, social, and other concern to the community. *Belk v. City of Eldon*, 228 F.3d 872, 878 (8th Cir. 2000) (citing *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684).

Chief Spadt acknowledges in his affidavit that Ms. Weigand "complained within the department, both personally and through an attorney, that she had suffered differential treatment because of her sex," and that she had also "complained within the department that a particular supervisor had on certain occasions failed to follow proper safety protocols." (Filing 63, attachment #3, ¶¶ 16, 17.) This evidence does not establish that the plaintiff engaged in protected speech. To the contrary, it supports a finding that her complaints were purely job-related.

The plaintiff's own allegations also lead to the conclusion that she was only voicing personal grievances. Thus, it is alleged that "[o]n or before November 18, 1998, Ms. Weigand began complaining to her supervisors about differential treatment she was receiving because of her sex," that "[o]n or about January 4, 2002, Ms. Weigand, through her attorney, complained to Defendant Spadt again about differential treatment she was receiving as compared to similarly situated male firefighters," and that "Ms. Weigand also complained that her direct supervisor was not following proper safety protocols, including proper ear protection, proper procedures for entering and exiting vehicles, and dealing with hazardous materials." (Filing 30, ¶¶ 11, 14, 15.)

However, even if it is assumed that Ms. Weigand's speech touched upon a matter of public concern, there is no evidence to establish a causal connection between that speech and the alleged adverse employment action. Chief Spadt, of course, denies that Ms. Weigand's complaints about sex discrimination or about her supervisor's failure to follow safety protocols were considerations when he demoted Ms. Weigand from "firefighter/paramedic" to firefighter. He states that the sole reason for the demotion was Dr. Rounsborg's revocation of Ms. Wiegand's paramedic privileges, which rendered her unqualified for the higher-paid position. (Filing 63, attachment #3, ¶¶ 16, 17.) It has not been shown that Chief Spadt participated in reassigning Ms. Weigand to administrative duty, or in any other alleged adverse employment action. Accordingly, he is entitled to qualified immunity on the plaintiff's "fourth cause of action."

### D. Conspiracy Claim

A successful claim under 42 U.S.C. § 1985 requires evidence of a conspiracy to deprive a plaintiff of civil rights.[13] *Johnson v. City of Shorewood*,

---

**13.** "To state a claim under the equal protection provisions of the first part of § 1985(3), [a plaintiff] must allege (1) a conspiracy, (2) for the purpose of depriving another of the 'equal protection of the laws, or of equal privileges and immunities under the laws;' (3) an act in furtherance of the conspiracy; and (4) an injury to a person or property, or the deprivation of a legal right. *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); 42 U.S.C. § 1985(3). A claim under this part of the section also requires proof of a class-based animus, *Grif-*

360 F.3d 810, 817 (8th Cir.2004). On summary judgment, then, it is Ms. Weigand's burden to advance some "facts which would suggest that [defendants] reached an understanding to violate [her] rights." *Id.* (quoting *Jensen v. Henderson,* 315 F.3d 854, 862 (8th Cir.2002)). Although Ms. Weigand speculates in her third amended complaint that Chief Spadt requested Dr. Rounsborg to revoke her paramedic privileges (filing 30, ¶ 15), there is no evidence to support this allegation.

▮ Also, absent a constitutional violation,[14] "there is no actionable conspiracy claim." *Slusarchuk v. Hoff,* 346 F.3d 1178, 1183 (8th Cir.2003) (quoting *Cook v. Tadros,* 312 F.3d 386, 388 (8th Cir.2002), *cert. denied,* 2004 WL 237911, 72 U.S.L.W. 3513, 3651, 3656 (Apr. 19, 2004)). As already discussed, there is no indication in the record that Ms. Weigand's constitutional rights were violated. Conclusory allegations of sex discrimination will not suffice. *See Palesch v. Missouri Commission on Human Rights,* 233 F.3d 560, 570 (8th Cir.2000).

Ms. Weigand's conspiracy allegations do not establish a claim for liability against Chief Spadt. He is immune from suit for damages on the plaintiff's "fifth cause of action."

---

*tin,* 403 U.S. at 102, 91 S.Ct. 1790, 29 L.Ed.2d 338. In addition, [a plaintiff] must allege that an independent federal right has been infringed. Section 1985 is a statute which provides a remedy, but it grants no substantive stand-alone rights. The source of the right or laws violated must be found elsewhere. *United Bhd. of Carpenters & Joiners of Am. v. Scott,* 463 U.S. 825, 833, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Great Am. Fed. Sav. & Loan Ass'n. v. Novotny,* 442 U.S. 366, 376, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979)." *Federer v. Gephardt,* 363 F.3d 754, 757–58 (8th Cir.2004) (footnotes omitted).

**14.** A litigant may not bring a claim under § 1985(3) to redress violations of Title VII.

## E. Title VII Claims

▮ Finally, the plaintiff asserts that the city and its "agents" discriminated and retaliated against her in violation of Title VII. As her attorney concedes, these statutory claims cannot be brought against Chief Spadt in his individual capacity. *See Roark v. City of Hazen,* 189 F.3d 758, 761 (8th Cir.1999) (a supervisor may not be held liable under Title VII).[15] Consistent with that concession, and with the approach taken by defense counsel in not otherwise addressing the Title VII claims, I construe the plaintiff's "sixth cause of action" and "seventh cause of action" as being brought against Chief Spadt in his official capacity only.[16] Consequently, there is no question of qualified immunity regarding these claims.

## III. CONCLUSION

On the record presented, the court finds that EMS and Dr. Rounsborg cannot claim qualified immunity, but that Chief Spadt is entitled to qualified immunity on all claims alleged against him in his individual capacity. Chief Spadt will remain a party to the action only in his official capacity.

Accordingly,

IT IS ORDERED that:

---

*See Novotny,* 442 U.S. at 375–76, 99 S.Ct. 2345.

**15.** *See also Lenhardt v. Basic Institute of Technology, Inc.,* 55 F.3d 377, 380 (8th Cir.1995) (discussing majority view that Title VII's definition of "employer," which includes an "agent," was intended to incorporate *respondeat superior* principles rather than to expose supervisors or co-workers to personal liability).

**16.** I need not decide at this time whether the Title VII claims apply to EMS and Dr. Rounsborg.

1. Filing 61, the motion for summary judgment on qualified immunity grounds filed by Defendant Michael L. Spadt, in his individual capacity, is granted.

2. Filing 72, the motion for summary judgment on qualified immunity grounds filed by Defendants Emergency Medical Services, Inc., and Terry Rounsborg, M.D., is denied.